UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WILLIAM McMAHAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:06-cv-1149-DFH-JMS |
| | ) |
| UMG MANUFACTURING & LOGISTICS, | ) |
| INC., | ) |
| | ) |
| Defendant. | ) |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff William McMahan has sued his former employer, defendant UMG Manufacturing & Logistics, Inc., for violating the Americans with Disabilities Act of 1990 ("ADA").  The ADA prohibits retaliation against a person for opposing any act or practice made unlawful by the ADA.  See 42 U.S.C. § 12203.  McMahan claims that when UMG fired him, it retaliated against him for reporting to another employee that he believed UMG was discriminating against her because of her disability.

This is a relatively rare retaliation case in which there is no dispute about whether the conduct in question triggered the plaintiff's firing.  Defendant has moved for summary judgment on two theories.  First, defendant argues that when plaintiff told the disabled co-worker about what he believed was improper activity by the employer, that was not activity protected by the ADA.  Second, defendant

argues that even if it was protected activity, plaintiff acted unreasonably by disclosing confidential information to the co-worker. As explained below, the court denies defendant's motion. A reasonable jury could find that plaintiff had a reasonable and good faith belief that he was acting to oppose actions by management that violated the ADA, and protected activity under the ADA can extend to telling the victim about suspected discrimination. The defendant's explanation based on disclosure of confidential information presents a jury question but does not entitle defendant to judgment as a matter of law.

*Summary Judgment Standard*

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual

disputes in the non-moving party's favor. *Id.* at 255. The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

*Facts for Summary Judgment*

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to the non-moving party, plaintiff William McMahan. *Anderson*, 477 U.S. at 255. McMahan began working as a maintenance technician for UMG, which manufactures CDs and DVDs at its facility in Fishers, Indiana, in 1998.

On April 19, 2005, McMahan received a work order to replace a belt on an air conditioner in the company's security monitor room. He had "explained to them I didn't know anything about air-conditioning units, and I'd been trying to get training or a book for a couple of years." *Id.* at 206. Two other maintenance technicians usually fixed any air-conditioning problems that arose. McMahan's experience was limited generally to cleaning filters. Just before McMahan received

the assignment on April 19th to replace the belt, however, the air-conditioning manual that McMahan had requested arrived.

That morning, McMahan went up to the security monitor room to evaluate the air-conditioning. The room usually was not locked, but a security guard sat at the bottom of the stairs to the monitor room to control access to the room. *Id.* at 74-76. When McMahan got up to the room, he saw that the air conditioner was mounted on the room's wall. McMahan spent some time that morning talking to one of the more experienced technicians about how to remove the unit.

While he was in the room, McMahan noticed that a particular image on a monitor near the door was different from the other images. The room had several rows of monitors with images of panoramic views of different work sections or of the building's entrances and exits. The image that McMahan noticed was zoomed in on a specific area, but he could not identify anything in the image. A label informed McMahan that the camera was focused on the "Value Added" department – a section where he frequently worked. A post-it note under the image warned "Do not move camera." *Id.* at 217. The note was curled, and McMahan thought it had been there for some time. *Id.* at 244. He spent an hour working on the air-conditioning project before he was paged to work on a more immediate maintenance problem.

He returned to the monitor room a little before lunch and continued working on removing the air-conditioning unit for another half hour. As he left the room after this second visit, he noticed that the camera focused on the "Value Added" section was actually focused on a particular employee in the section: Tammie Demougin. Demougin was one of the few union employees permitted to sit while working. McMahan had heard that "she'd won an EEOC case against the company to be allowed to sit in a chair." *Id.* at 230. Demougin's husband had told McMahan that "they weren't supposed to be messing with her sitting in a chair." *Id.* at 269-70. McMahan felt that the image was "an extreme close-up" and that the close-up was discrimination "against her because she was in her chair, and they weren't supposed to be doing anything about her in her chair." *Id.* at 232.

Later in the afternoon, McMahan returned to the monitor room to finish removing the air-conditioning unit. Each time he looked at the camera focused on the "Value Added" section, the camera was focused on Demougin. After he removed the air-conditioning unit, McMahan brought it down the stairs and over to his work area. He passed Demougin on the way and stopped to tell her about the camera position "to let her decide how she should handle it." *Id.* at 234. Demougin told McMahan that management was asking her about things "that they couldn't have possibly known" unless "they were watching her on the camera." *Id.* at 235.

Demougin tried to call over her union steward, Linda Dickerson. According to McMahan, Dickerson would not come over to talk. He suspected that it was because Dickerson did not like him. *Id.* at 247.[1] In any event, Demougin called over another steward, Tyrone Caldwell. McMahan explained to Caldwell about the camera focused on Demougin. Caldwell went to see Rodney Jones, the company's vice president, about the issue. McMahan thought Demougin and Caldwell filed a grievance against UMG about the camera position. When McMahan reinstalled the air-conditioning unit in the monitor room the next day, the "Value Added" camera was still focused on Demougin. Defendant has pointed out that Demougin's attendance records indicate that Demougin was absent on April 20, 2005, but for present purposes, the court accepts McMahan's testimony on the point.

On April 21, 2005, according to McMahan, he went back to the monitor room to make sure the air-conditioning unit had freon. He noticed that the "Value Added" camera had been pulled back to a panoramic view of the entire section and that the post-it note was gone. *Id.* at 253-54. He told Demougin that the camera position had been moved. McMahan thought the changes meant that "the system

---

[1] Defendant submitted three still images pulled from UMG's security cameras showing three people a little after noon on April 19, 2005. Def. App. 4, Ex. A. Defendant's security manager identified these people as plaintiff, Tammie Demougin, and Linda Dickerson. According to McMahan, he did not inform Demougin about the camera position until later that afternoon. For purposes of summary judgment, the images show at most that McMahan might have had a conversation with Demougin and Dickerson earlier in the day.

worked. Whatever was going on, it got taken care of and it wasn't an issue anymore." *Id.* at 255.

That is not how things turned out. On April 25, 2005, Kathy Young, UMG's human resources director, called McMahan into her office. McMahan asked Young if the meeting was about "the discrimination of Tammie being on the camera." *Id.* at 259. McMahan thought Young was investigating "what had happened so they could find out who was manipulating the cameras to watch people." *Id.* at 266-67. He told Young about what he had seen and about his conversations with Demougin and Caldwell. Later that afternoon, Young called McMahan back into her office. McMahan's direct supervisor, Clint Furgaston, was also there. Young told McMahan that UMG was terminating his employment "due to a severe security breach with the company." *Id.* at 263. McMahan told Furgaston, "don't you think it's kind of odd that I report a discrimination case and they fire me." *Id.* Furgaston did not really respond. Furgaston escorted McMahan out of the building, someone else brought him his coat, and that was McMahan's last day at UMG.

McMahan filed a timely retaliation charge with the EEOC on August 3, 2005. Def. App. 9. Plaintiff sued defendant in this court on July 27, 2006, alleging that UMG violated the ADA. McMahan also alleged that UMG violated his rights under the Family and Medical Leave Act, but in his response to summary judgment, he concedes that the FMLA claim should be dismissed. Pl. Resp. 1,

-7-

n.1.  This court has jurisdiction under 28 U.S.C. § 1331.  Additional facts are noted as needed, keeping in mind the standard applicable for summary judgment.

*Discussion*

The ADA bars discrimination "against any individual because such individual has opposed any act or practice" that the ADA prohibits.  42 U.S.C. § 12203(a).  To prove his claim under section 12203(a), McMahan must show that UMG fired him because he engaged in protected activity.  See *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (setting forth direct method of proving retaliation).  McMahan claims that UMG retaliated against him by firing him for telling Demougin about the security camera focused on her.  Defendant does not argue that it fired McMahan for any other reason.  This is a rare retaliation case in which the issue is not why the defendant took action against the plaintiff.  The principal dispute here is whether McMahan engaged in activity protected by the ADA when he told Demougin that one of UMG's security cameras was focused on her.

UMG argues that McMahan's report to Demougin was not protected activity because he did not communicate his complaint to company management.  Def. Br. 15.  As UMG sees the matter, McMahan had not "opposed any act or practice made unlawful by this chapter . . . ."  See 42 U.S.C. § 12203(a).  UMG has not supported this argument with any authority holding that an employee must have communicated his complaint to company management rather than to the victim

of the alleged wrongdoing. The parties and the court have not identified Seventh Circuit precedent that controls the issue.

The opposition clauses in the retaliation provisions of federal employment discrimination laws cover a broad range of behavior. See generally 1 Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 1007-15 (C. Geoffrey Weirich et al. eds., 4th ed. 2007) (collecting examples of behaviors courts found constituted opposition). Contrary to defendant's argument that McMahan is not protected by law unless he complained to a manager about the camera position, the authors of the cited treatise observed that opposition encompasses "complaints about the employer to others that the employer learns about." *Id.* at 1013, citing *Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir. 2001) (affirming district court's denial of employer's motion for judgment as a matter of law and refusal to set aside jury verdict for employee; finding that employee's report to police about sexual harassment constituted opposition under Title VII); *Conetta v. National Hair Care Centers, Inc.*, 236 F.3d 67, 76 (1st Cir. 2001) (affirming district court's refusal to set aside default entry; recognizing that complaining about harassment to management, to another employee, or to "anyone else" constitutes opposition under Title VII).

The Sixth Circuit and Second Circuit have also recognized that the opposition clauses protect a wide range of behavior. In *Johnson v. University of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000) (reversing summary judgment for

defendants on Title VII retaliation claim), the court observed: "Of critical import here is the fact that there is no qualification on who the individual doing the complaining may be or on the party to whom the complaint is made known – i.e., the complaint may be made by anyone and it may be made to a co-worker, newspaper reporter, or anyone else about alleged discrimination against oneself or others." The Second Circuit has observed that "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989) (vacating district court's grant of judgment as a matter of law for employer; interpreting opposition clause in Age Discrimination in Employment Act of 1967).

The EEOC's compliance manual defines opposition in the retaliation context as complaining about alleged discrimination "to anyone" as well as "to a manager, union official, co-worker, company EEO official, attorney, newspaper reporter, Congressperson, or anyone else." U.S. Equal Employment Opportunity Commission, EEOC Compliance Manual § 8-II(B)(2) (1998), *available at* http://www.eeoc.gov/policy/docs/retal.html (last visited March 27, 2008). McMahan has also presented evidence that UMG trained its employees to report discrimination against a co-worker directly to that co-worker to "let them handle it." McMahan Dep. 240.

Viewing the evidence here in the light most favorable to plaintiff, his complaint here was not at all ambiguous.[2] He specifically told Demougin that he felt the camera position was discrimination against her because of her physical accommodation. McMahan told a union steward that he believed the camera position was discrimination against Demougin because UMG accommodated her need for a chair. McMahan Dep. 247-51. When the human resources director questioned McMahan, he told her that he believed the camera position was discrimination against Demougin because of her need to sit in a chair. *Id.* at 258-61. By the time UMG fired McMahan, it knew that McMahan opposed the camera position, and it knew that he opposed the camera position because he felt that it discriminated against someone for whom UMG had made a physical accommodation for a disability. McMahan's complaint to Demougin about the camera position constituted opposition under the ADA.

---

[2] Ambiguous complaints or complaints that the employer never finds out about do not constitute protected opposition. See *Sitar v. Indiana Department of Transportation*, 344 F.3d 720, 727 (7th Cir. 2003) (affirming summary judgment for employer on retaliatory transfer claim; employee "need not use the magic words" of discrimination but must say something to indicate that a protected class is at issue); *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1136-38, 1146-47 (7th Cir. 1997) (affirming summary judgment for employer where employees generally complained about supervisor but never complained about discriminatory behavior while working for employer); see generally *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 374, 376 (7th Cir. 2007) (affirming summary judgment for employer; finding that employee's instant message to a co-worker telling the co-worker to stop staring did not alert employer to type of discrimination employee alleged); *Durkin v. City of Chicago*, 341 F.3d 606, 612-13, 615 (7th Cir. 2003) (affirming summary judgment for employer; complaints that "were vague and concerned subject matters other than harassment" did not constitute opposition).

There are limits, however, to this broad definition of opposition. The employee does not need to show that the practice actually violated the ADA, but he must have based his opposition on a reasonable, good faith belief that the practice he opposed violated the ADA. *Talanda v. KFC National Management Co.*, 140 F.3d 1090, 1096 (7th Cir. 1998). McMahan alleges here that UMG retaliated against him for complaining about retaliation UMG took (in positioning the camera) against Demougin for filing an EEOC charge and obtaining an accommodation under the ADA. Thus, the legality of Demougin's request must be viewed under two layers of reasonable, good faith. McMahan has testified that he learned from Demougin's husband that she had "won an EEOC case against the company to be allowed to sit in a chair" and "they weren't supposed to be doing anything about her in her chair." McMahan Dep. 230, 232. To the extent that the validity of Demougin's need for a chair is relevant, McMahan has presented sufficient evidence to demonstrate a reasonable and good faith belief that Demougin needed a chair under the ADA. See generally 29 C.F.R. § 1630 App. § 1630.2(i) (noting that walking and standing are major life activities that may be protected by the ADA if impaired).[3]

---

[3]UMG's reliance on *Talanda v. KFC National Management Co.* is not persuasive. The plaintiff in *Talanda* was a manager who was fired after he refused a direct order to transfer an employee from working at the front counter of restaurant to the kitchen area. The employee was missing a number of teeth and her face was disfigured to the extent that the manager's supervisor did not want her at the front counter. The Seventh Circuit affirmed summary judgment for the employer, concluding that the manager could not have had a reasonable and good faith belief that the employee was protected by the ADA as a qualified individual with a disability limiting any major life activities. 140 F.3d at 1096-98. In this case, however, there is sufficient evidence that McMahan reasonably believed that
(continued...)

The key question is whether McMahan had a reasonable and good faith belief that someone at UMG had deliberately aimed the camera at Demougin to retaliate against her for asserting her rights under the ADA. As UMG points out, special camera surveillance may not be sufficiently adverse to support a primary retaliation claim. See *Campbell v. Cummins, Inc.*, No. 4:03-cv-149, 2005 WL 775932, at *13 (S.D. Ind. Mar. 25, 2005) (granting summary judgment for employer on Title VII retaliation claim; finding that installation of camera in plaintiff's work area, without any other details such as the camera's position or focus, was not materially adverse because there was no evidence that the "installation was humiliating, degrading, or otherwise a significantly negative alteration in her workplace environment, or that it created a hardship"). But to prove his retaliation claim, McMahan is not required to prove that UMG was *actually* violating the ADA by keeping a camera aimed constantly at Demougin's work station. Requiring employees to prove the illegality of the underlying discrimination (here, retaliation) in retaliation claims "destroys one of the chief means" of eliminating workplace discrimination. *Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045 (7th Cir. 1980) (reversing summary judgment for employer where employer fired employee for opposing in reasonable, good faith a category of behavior that did not constitute discrimination). Retaliation provisions are "designed to encourage employees to call to their employers' attention

---

³(...continued)
Demougin was protected by the ADA and might be the target of discrimination or retaliation because she had asked for an accommodation in the form of being able to remain seated on the job.

discriminatory practices of which the employer may be unaware or which might result in protracted litigation to determine their legality if they are not voluntarily changed." *Id.*

Here, according to McMahan, he found and reported that UMG was scrutinizing and recording the activities of just one employee who he believed had filed charges with the EEOC against the company. All the other cameras that McMahan observed took panoramic shots and did not focus on one employee. When McMahan told Demougin that a camera was focused specifically on her, she told him that management had been asking her "what are you doing this for, you're out of your chair too much, you're eating at your chair. Stuff that they couldn't have possibly known." McMahan Dep. 235. Based on this evidence, a reasonable jury could determine that McMahan reasonably and honestly believed that UMG, by aiming a camera constantly at Demougin, was keeping her under special scrutiny and discriminating or retaliating against her for asserting her ADA right to reasonable accommodation for a disability.

The other limit that defendant argues applies here deals with the manner in which the employee manifests his opposition. Several circuits have found that otherwise protected opposition can lose its protection if expressed in an unreasonable manner. See 1 Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 1015-21 (C. Geoffrey Weirich et al. eds., 4th ed. 2007); see also *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d at 1098 n.14 (declining

-14-

to address alternative ground for summary judgment based on arguable unreasonableness of plaintiff's methods of opposing perceived discrimination).

Defendant cites *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222 (1st Cir. 1976) (affirming denial of preliminary injunction pending resolution of employee's EEOC charge), and *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025 (5th Cir. 1980) (affirming dismissal after trial of retaliation claim for opposing unlawful practices), to argue that McMahan's opposition was unreasonable because he disclosed confidential information – namely, the position of the security camera in the "Value Added" department. Neither case shows that defendant in this case was justified, as a matter of law, in firing McMahan for telling Demougin about the camera focused on her. Both cases affirmed findings of trial courts – in *Jefferies*, after a full trial, and in *Hochstadt*, after a five-day preliminary injunction hearing. Neither case resolved the issue as a matter of law.

In *Hochstadt*, the employee worked as a scientist for a biomedical research foundation. 545 F.2d at 227. Soon after starting, she claimed that the foundation discriminated against female employees by paying them less than their male counterparts. She filed an EEOC charge and several lawsuits based on disparate pay and the adequacy of the foundation's affirmative action program. To support her claims, the employee tried to elicit salary information from other employees, sometimes interfering with ongoing research and upsetting other employees in the

process. She invited another scientist to compile an affirmative action survey that was later reported to several members of Congress. She generated a $950 telephone bill (in 1974!) for the foundation calling the scientist as well as her lawyer. Several research assistants quit because of their difficulties with the employee. The employee also started rumors that the foundation would lose its funding because of its inadequate affirmative action program. After filing her suits, the employee invited a newspaper reporter to "examine her files containing confidential salary information" of other employees. *Id.* at 228. The reporter used this information to publish several articles.

In affirming the denial of the employee's motion for a preliminary injunction, the *Hochstadt* court recognized that it was "plainly a delicate matter to separate out the protected from the nonprotected conduct." *Id.* at 229. The court balanced the retaliation provision's purpose of protecting employees opposing discrimination with the employer's need to select and control personnel. *Id.* at 231. In the end, the sum of the employee's "militant self-help activity," including her disclosures of confidential information, went too far, or at least the district court had not clearly erred in so finding after hearing the evidence on a motion for preliminary injunction.

In *Jefferies*, the employee was a black woman who applied for a job with the corporation where she already worked. 615 F.2d at 1028-29. The same day that she applied for the job, she saw a personnel form indicating that a black male had

-16-

already been hired for the position. The acting personnel manager told her the job announcement to which she responded had been posted mistakenly. Believing the denial of her application to be discrimination, the plaintiff secretly copied the man's personnel form and sent it along with other personnel materials to the chair of the company's personnel committee. The chair notified the acting personnel manager that the plaintiff had disseminated confidential personnel records. The acting manager fired the plaintiff.

After a bench trial, the district court found for the employer, concluding that the employer fired the plaintiff in good faith for violating the confidentiality of personnel records and not because she had opposed what she believed was discrimination. *Jefferies v. Harris County Community Action Ass'n*, 425 F. Supp. 1208, 1213-14, 1216 (S.D. Tex. 1977). The Fifth Circuit affirmed in relevant part, recognizing that the plaintiff had copied the records to expose what she felt was an unlawful practice, but affirming the district court's finding that under the circumstances, the surreptitious copying and dissemination were unreasonable:

> She has not established that HCCAA would have destroyed the documents had she not taken action to preserve them, and has not made a colorable claim that she reasonably believed there was a need to act as she did. Nor has Jefferies attempted to show that the grievance procedure in place at HCCAA at the time of her actions was inadequate.

*Id.* at 1036. Under those circumstances, the court found that the employer's interest in protecting the confidentiality of the documents outweighed the plaintiff's interest in opposing perceived discrimination.

-17-

Neither side cited, and this court has not found, any Seventh Circuit case adopting either this reasonableness requirement or the First and Fifth Circuits' balancing test. To the extent, however, that the situations in *Hochstadt* or *Jefferies* are similar to the present case, they do not show that UMG is entitled to judgment as a matter of law. At best, the cases show that there is a factual issue that a jury must decide about whether it was reasonable for UMG to fire McMahan for acting as he did. In addition, the evidence most favorable to McMahan supports his claim. First, according to McMahan, UMG trained him and other employees to report discrimination against a co-worker to that co-worker so that the co-worker could decide how best to handle the situation. Second, McMahan legitimately had access to the monitor room and did not attempt to copy or distribute the image he saw – secretly or otherwise. Third, he did not try to take matters into his own hands by tampering with the monitor or by trying to change the camera position. Fourth, he voluntarily told only Demougin and a union steward. He did not publicize the camera position to anyone outside the company. Those circumstances, and perhaps others, could lead a reasonable jury to find that UMG did not act reasonably or in good faith in firing McMahan for opposing what he believed was unlawful discrimination or retaliation.

Plaintiff McMahan has also presented evidence that his conduct is protected by 42 U.S.C. § 12203(b), which bars employers from coercing, intimidating, threatening, or interfering with anyone who exercises his own rights under the ADA or who helps or encourages others to exercise their rights under the ADA.

Defendant UMG argues that § 12203(b) protects only individuals who help or encourage family members to exercise ADA protection. Defendant cites three cases to support that interpretation: *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 570-71 (3d Cir. 2002); *Wychock v. Coordinated Health Systems*, No. 01-3873, 2003 WL 927704, at *6 (E.D. Pa. Mar. 4, 2003); *O'Connell v. Isocor Corp.*, 56 F. Supp. 2d 649, 653-54 (E.D. Va. 1999). Those cases all found that § 12203(b) protected from third-party retaliation individuals who did not engage in protected activity themselves but were relatives of persons who engaged in protected activity. In this case, McMahan himself engaged in protected activity (opposition), so defendant's argument misses the mark. McMahan has presented evidence that UMG knew he told Demougin about the camera position so that she could resolve the problem herself, which is sufficient for the § 12203(b) claim to survive summary judgment.

*Conclusion*

For the foregoing reasons, the court DENIES defendant's motion for summary judgment on plaintiff's ADA retaliation claim but GRANTS summary judgment on plaintiff's FMLA claims based on plaintiff's appropriate concession.

So ordered.

Date: March 31, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

-19-

Copies to:

Tami A. Earnhart
ICE MILLER LLP
earnhart@icemiller.com,mary.williams@icemiller.com

Scott James Preston
ICE MILLER LLP
spreston@icemiller.com,teresa.graham@icemiller.com

Ronald E. Weldy
WELDY & ASSOCIATES
weldy@weldylaw.com